No. 38,211

L. M. FYLER and HANNAH J. FYLER, *Appellees,* v. B. B. HARTNESS and LILLIAN HARTNESS, *Appellants.*

(229 P. 2d 751)

Opinion filed April 7, 1951.

*Abraham Weinlood,* of Hutchinson, argued the cause, and *Don Shaffer,* of Hutchinson, was with him on the briefs for the appellants.

*Max Wyman,* of Hutchinson, argued the cause, and *Don Wyman,* of Hutchinson, was with him on the briefs for the appellees.

The opinion of the court was delivered by

PRICE, J.: This appeal grows out of a boundary line dispute between two neighbors in Hutchinson over the location of the lot line between their residential properties. From a judgment quieting plaintiffs' title to and enjoining defendants from interfering with their enjoyment and possession of the property in dispute, defendants have appealed.

Plaintiffs are the owners of the west ten feet of lot 21 and all of lot 23. Defendants are the owners of lots 25 and 27. Lot 25 adjoints lot 23 on the west. The ownership of the east several feet of lot 25 is in dispute.

Back in 1888 one Lentz became the owner of lots 23 and 25, and built two houses thereon. He erected a fence between them. Plaintiffs' house now stands just as it was built. The fence has been maintained in its original location for over sixty years. Down through the years lot 23 passed through the hands of a number of owners, and the same is true of lot 25. In April, 1930, plaintiffs purchased the west ten feet of lot 21 and all of lot 23, including the house thereon, from one Loucks, the then owner, and moved onto the property. In 1933 the defendants moved onto lots 25 and 27, as renters, and continued to live in the house, which appears to be on lot 27, until 1945, when they purchased both lots and the house from the then owners, Clayton and Pursel. Thereafter defendants continued to occupy the property as owners. No question concerning the location of the fence between lots 23 and 25 was ever raised until 1949, when defendants had a discussion with their neighbors to the west about the repair of a fence between their properties. As a result of this discussion defendants caused a survey to be made to determine the proper location of the fence on the west side of their property. From this survey it developed that the fence, supposedly on the line between lots 23 and 25, owned by plaintiffs and defendants, respectively, was 5-6/10 feet west of the true line. Another survey was made which showed the fence to be approximately 4-9/10 feet west of the true line between lots 23 and 25. Assuming these surveys to be substantially correct, it was then established that the house of plaintiffs was approximately three feet across the line on lot 25, and that the water line to plaintiffs' house was approximately two feet across the line on lot 25. A dispute arose between the parties, defendants tore down the fence in question—hence this lawsuit.

The evidence in behalf of plaintiffs was to the following effect:

A son of plaintiffs testified that he was with his parents when they purchased the property from Loucks; that they went upon and examined the property and were shown where the boundary was, namely, the fence line; that the water line was put in within a year before the survey was made, with no objection on the part of defendants; that his parents had always occupied the property up to the fence; that defendants had always planted flowers along the west side of the fence line ever since they had occupied lots 25 and 27; that in 1946 the fence was repaired by plaintiffs without objection by defendants; that no controversy had ever arisen between the parties until the survey was made; and that according to measurements made by the witness defendants still had sixty feet of ground (the lots being thirty feet in width each) even taking the fence line as the true boundary.

Another witness, a sister-in-law of plaintiffs' grantor Loucks, testified that she was familiar with the properties in years past; that a fence had always been maintained in its present location, and that plaintiffs' grantor had always kept up the fence when he lived in the property.

A workman who had replaced the fence for plaintiffs in 1946 testified that there was no remonstrance from anyone about its location at the time he did the work.

Still another witness, who in 1922 lived in the house now occupied by plaintiffs and in 1923 lived in the property now occupied by defendants, testified as to the fence being in its present location at that time and that it was considered to be the boundary line between the properties.

An affidavit of the wife of plaintiffs' grantor was introduced in evidence, and the substance of it was that in 1919, when her husband acquired the property now owned by plaintiffs, a fence was maintained in its present location; that it was represented to her and her husband that it was on the west line of the property they were purchasing; that they claimed the fence and all ground east of it; that when she and her husband sold the property to plaintiffs all of them went upon the premises; that the fence was pointed out to plaintiffs as being the west boundary line of the property plaintiffs were purchasing; and that affiant and her husband told plaintiffs they would own the ground extending forty feet east of the fence line.

In addition thereto plaintiffs introduced records of the office of

register of deeds, probate court, and clerk of the district court of Reno County.

Defendants demurred to plaintiffs' evidence on the grounds that it failed to make out a cause of action; that no adverse possession had been established; that no agreement as to the fence constituting the true boundary line had been shown; and that the most the evidence showed was that it merely had been the understanding of all parties concerned that the fence was the true boundary line, but that such understanding was the result of mutual mistake and therefore insufficient to constitute adverse possession within the meaning of the law.

Ruling on the demurrer was reserved; whereupon defendants proceeded with their evidence.

The only evidence on behalf of defendants was the testimony of Mr. Hartness, a defendant, and he testified that he owned lots 25 and 27; that his house was on lot 27, lot 25 being vacant; that he bought the property in about 1945, but had lived there as a renter for some twelve years before purchasing it; that he had discussed the matter with plaintiffs, told them he intended to have a survey, and that plaintiffs asked him if he would sell them enough footage so as to clear their house in the event it should develop that the true boundary ran through their house; that he replied in the affirmative and afterwards he had the survey made. He further testified that he had made no protest when plaintiffs put up a new fence in 1946, or when they had a water line installed; had never asked plaintiffs to move the fence; recognized the fact plaintiffs planted garden on the strip now in dispute and occupied everything up to the fence on their side, and admitted that he didn't know where the true line was and didn't inquire about it over a period of years, and that he had never claimed the strip in dispute until after the survey.

The record does not show that either side requested the court to make conclusions of fact or of law, as provided by G. S. 1949, 60-2921, but in the journal entry of judgment are certain findings and conclusions denominated as such. The court found the facts to be substantially in accord with the above summary of the evidence, and further found:

"Fourth. That the evidence conclusively shows that there has been a fence upon the place which has always been considered the boundary line between these two lots since before 1900 and probably since 1888 when the first fences were erected thereon."

and for its conclusions of law (insofar as this appeal is concerned) held:

"FIRST. That when the plaintiffs purchased this property in 1930 from the owner of both pieces of property that they purchased all of the ground to and including the fence as it was then standing and that the plaintiffs are entitled to have their title quieted to all of Lot 23 and so much of Lot 25 as extends to the fence line and a permanent injunction against the defendants from interfering with their enjoyment and possession thereof."

Defendants moved for additional conclusions of fact to the effect that the descriptions contained in the deeds to all parties concerned and their respective predecessors refer to lot numbers in unambiguous and certain language; that a true line between lots 23 and 25 has always been a fixed and ascertainable line; that both parties and their respective predecessors in title had always assumed and believed the fence in question was on the true line between such lots until the time of the survey in 1949, but that such assumption and belief were a mistake; and that there had never been any agreement between the parties or between their respective predecessors in title that the fence should be regarded as the boundary line between the lots regardless of where the true boundary line actually existed.

Defendants further moved the court to set aside its conclusion of law and to find that plaintiffs had failed to establish their claim under the doctrine of adverse possession, agreement of the parties, or by estoppel.

These motions were overruled and judgment was entered in favor of plaintiffs in accordance with the conclusion of law above set out.

While defendants' specifications of error, some of which refer to alleged trial errors such as pertain to the admissibility of evidence, are sixteen in number, yet from their brief and oral argument it is clear that reliance for a reversal of this judgment is based chiefly upon the fact there was no evidence, and the court did not find, that plaintiffs' right to recovery was based on adverse possession, agreement of the parties, or estoppel.

On the other hand, plaintiffs, while conceding the force of defendants' argument based on the long-established rule that adjacent landowners are not estopped to dispute the accuracy of a boundary line which by mistake they have long treated as such, and that occupancy beyond the true boundary line as the result of such mistake does not form a basis for adverse possession unless

such encroachment is made with intention to claim and hold adversely (*Kinne v. Waggoner*, 108 Kan. 814, 197 Pac. 195), contend that here the evidence clearly showed an agreement between the parties and between their respective predecessors in title that the fence which had been in existence down through the years was the boundary line between their properties, and they rely on *Blanford v. Biven*, 123 Kan. 269, 254 Pac. 1030; *Baker v. Jones*, 141 Kan. 240, 40 P. 2d 346; *Shafer v. Leigh*, 112 Kan. 14, 209 Pac. 830; *Schlender v. Maretoli*, 140 Kan. 533, 37 P. 2d 993; *Howell v. Kelly*, 129 Kan. 543, 283 Pac. 500; and the early case of *Sheldon v. Atkinson*, 38 Kan. 14, 16 Pac. 68, in support of their position.

In the Schlender case, *supra*, the facts of which are somewhat analogous to those in the case at bar, it was held:

"Where two parties at different times purchase adjoining lots, which are conveyed to them separately by no other description than by number only, and there exists at the time they become such separate owners a fence, considered and regarded by both parties as being on or near the dividing line between the lots, and there is evidenc of a later agreement between the two owners that the existing fence shall be accepted and regarded by them as being on the dividing line, although it may not be exactly on the correct line, such fence becomes and is the true dividing line between the lots by virtue of such agreement even if a subsequent survey should establish a different boundary line." (Syl.)

Applying that rule to the facts before us, we think the lower court's judgment was correct. Notwithstanding the description contained in each of the conveyances (by lot number) under which the parties became the owners of these properties, there was ample evidence to establish that both plaintiffs and defendants, when purchasing, recognized the fence in question as being the boundary line between lots 23 and 25. Defendants knew the fence was there; knew that plaintiffs claimed all footage up to the fence, and when they purchased their property defendants certainly did not consider they were purchasing any part of the house occupied by plaintiffs. While it is true there was no direct evidence of a definite and specific agreement between the parties that the fence line was the true boundary, regardless of what a survey would actually show it to be, yet we think the evidence, taken as a whole, clearly shows, such agreement circumstantially, and the same is true of their predecessors in title down through the years. Both parties were satisfied, and recognized and understood they were purchasing to the fence.

In passing, we take note of defendants' complaint that in its conclusion of law the court's language indicates that it found plaintiffs purchased their property from the owner of "both pieces of property," meaning lots 23 and 25, when there is no basis in the evidence for such finding. We think defendants' contention in this respect is erroneous. It was not claimed that the parties purchased from a common grantor, and we understand the language in the court's conclusion to mean that plaintiff's grantor owned both lots 21 and 23, rather than lots 23 and 25. We have examined and considered all other contentions made by defendants but find them to be without substantial merit. We find nothing in this record approaching reversible error.

In conclusion, we hold that the finding and judgment of the lower court are based upon substantial, competent evidence, and such being the case, will not be disturbed on appeal. The judgment of the lower court is therefore affirmed.

PRICE, J. (dissenting): I am unable to agree with the holding of the court in this case. As I read this record there is only one conclusion to be drawn from the evidence, namely, the parties simply occupied their respective properties up to the fence line in the mistaken belief that it was on the true and correct boundary line between lots 23 and 25. While it is true that defendants acquiesced in such occupancy by plaintiffs, yet I do not think such mere acquiescence, under the facts of this case, can be held to constitute an agreement between the parties that the fence was the dividing line between their properties.

In rendering judgment for plaintiffs the trial court did not base its holding upon any specific ground, such as adverse possession, agreement of the parties, or estoppel; but, it seems clear to me that the court's reasoning must have been based upon one or all three of those grounds. I have already indicated that I think there was a total lack of evidence so as to work an estoppel either by agreement of the parties or acquiescence on the part of defendants. And, with reference to adverse possession, the rule in this state is well-settled. In a very recent case (*Wilson v. Pum Ze*, 167 Kan. 31, 204 P. 2d 723), in which many of our earlier authorities were reviewed, it was held:

"Many other decisions of this court have settled the proposition that mistaken and unintentional possession in opposition to the true title holder, con-

tinued over a long period of time through ignorance and inadvertence, will not constitute such adverse possession as will ripen into title by prescription." (p. 33.)

In that decision we quoted from *Craig v. Paulk*, 162 Kan. 280, 176 P. 2d 529, where it was said:

"Ownership of land cannot be established by adverse possession where occupancy was taken and continued under a mistake as to the true boundary line and where no clear intention is shown to claim the land to a certain line regardless of whether such line is the correct boundary." (Syl. 4.)

In *Steinbruck v. Babb*, 148 Kan. 668, 84 P. 2d 907, it was stated:

"Open, notorious and exclusive occupancy of a strip of land for the period required by the statute of limitations, under the mistaken belief that the fence constituted the true boundary between the adjoining landowners, is not sufficient to make the possession adverse or hostile, but there must be proof or a conclusive inference of an unconditional intent to claim title and notice of such hostile intent or acquiescence therein." (Syl. 1.)

And so here. To me this is simply a situation where the parties over a period of years regarded the fence as the true boundary on account of a mistaken belief on the part of all concerned. I find nothing in the record to indicate that plaintiffs occupied all footage clear to the fence with any hostile intention to claim everything to the fence regardless of whether the fence was on the true and correct boundary. Both parties were simply mistaken and the mistake was not known until the survey was made. For the reasons stated I feel that the judgment of the lower court must be reversed.

WEDELL and PARKER, JJ., join in the foregoing dissenting opinion.